**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

G. GRANT LYON,
    *Plaintiff-counter-defendant-*
                *Appellee,*

          v.

GILA RIVER INDIAN COMMUNITY,
    *Defendant-counter-plaintiff-*
              *Appellant.*

No. 08-15570
D.C. No.
05-CV-02045-JAT

In re: MICHAEL KEITH SCHUGG,
DBA Shuburg Holsteins; DEBRA
SCHUGG,
                *Debtor,*

G. GRANT LYON,
    *Plaintiff-counter-defendant-*
    *Appellee Cross Appellant,*

          v.

GILA RIVER INDIAN COMMUNITY,
    *Defendant-counter-plaintiff-*
    *Appellant Cross Appellee.*

No. 08-15712
D.C. No.
2:05-CV-02045-JAT
OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted
January 14, 2010—San Francisco, California

Filed November 24, 2010

18775

Before: Alex Kozinski, Chief Judge, J. Clifford Wallace and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Wallace

**COUNSEL**

Patricia A. Millett (argued), Mark J. MacDougall and Troy D. Cahill, of Akin Gump Strauss Hauer & Feld LLP, Washing-

ton, D.C., and Jennifer Kay Giff, Pima Maricopa Tribe Law Office, Sacaton, Arizona, for appellant/cross-appellee Gila River Indian Community.

Paul F. Eckstein (argued), Richard M. Lorenzen and Joel W. Nomkin, Perkins Coie Brown & Bain P.A., Phoenix, Arizona, for appellee/cross-appellant G. Grant Lyon.

## OPINION

WALLACE, Senior Circuit Judge:

This appeal involves a dispute between an Indian tribe and the trustee of a bankruptcy estate over the rights of access to and occupation of a parcel of land completely surrounded by Indian reservation land. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1334. We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291, and we affirm in part and vacate in part.

### I.

The center of the parties' dispute is "Section 16," a parcel of about 657 acres in Pinal County, Arizona. The land surrounding Section 16 is part of an Indian reservation (Reservation) belonging to the Gila River Indian Community (Community), a federally recognized Indian tribe. We start with the history of Section 16 and the Reservation.

The Community historically occupied the land that is now south-central Arizona. *See Gila River Pima-Maricopa Indian Cmty. v. United States*, 24 Ind. Cl. Comm'n 301, 303, 335 (1970). Through the 1853 Gadsden Purchase, the United States acquired title to land from Mexico, including what is now Section 16. The following year, Congress adopted a law providing that when a survey was completed of the lands

within the purchased territory, "sections numbered sixteen and thirty-six in each township, in said Territory, shall be, and the same are hereby, reserved for the purpose of being applied to schools in said Territory, and in the States and Territories hereafter to be created out of the same." Act of July 22, 1854, ch. 103, § 5, 10 Stat. 308, 309. The lands were not literally meant to be sites for school buildings. Instead, the state was able to sell and lease them to produce funds supporting its schools. *Lassen v. Arizona ex rel. Ariz. Highway Dep't*, 385 U.S. 458, 463 (1967). In 1863, Congress partitioned the Territory of New Mexico to create the Territory of Arizona. Act of Feb. 24, 1863, ch. 56, § 1-2, 12 Stat. 664, 664-65. Section 16 became property of Arizona when a survey of the land was filed in 1877. *See United States v. S. Pac. Transp. Co.*, 601 F.2d 1059, 1067 (9th Cir. 1979).

In 1859, Congress created a reservation for the Community. Act of Feb. 28, 1859, ch. 66, § 3-4, 11 Stat. 388, 401; *see also Gila River Pima-Maricopa Indian Cmty.*, 24 Ind. Cl. Comm'n at 303. The Reservation did not originally abut Section 16; the borders of the Reservation were later enlarged through a series of executive orders. Of relevance here, an executive order dated November 15, 1883 added to the Reservation a parcel of land immediately to the north of Section 16, and an executive order dated June 2, 1913 added to the Reservation the land immediately to the south, east and west of Section 16. The result is that since 1913, Section 16 has been completely surrounded by Reservation land. Section 16 can be accessed using Smith-Enke Road, an east-west road that runs adjacent to the southern boundary of Section 16 and crosses Reservation land before continuing west to the City of Maricopa and east to the City of Sacaton. Section 16 can also be accessed by Murphy Road, a north-south road that runs adjacent to the eastern boundary of Section 16 and crosses Reservation land before continuing south to the City of Maricopa, and north for two miles until intersecting with another road at a point within the Reservation.

The State of Arizona held Section 16 until 1929, when it sold the parcel to an individual named J.L. Hodges, pursuant to a patent conveying the land "together with all the rights, privileges, immunities and appurtenances of whatsoever nature" and "subject to any and all easements or rights of way heretofore legally obtained." Section 16 has since been sold several times, each time conveyed by a deed containing similar language. In 2001, a company called S&T Dairy, L.L.C., owned by the children of Michael and Debra Schugg (the Schuggs), purchased Section 16 and constructed a dairy on the property. In 2003, S&T Dairy conveyed Section 16 to the Schuggs. In 2004, the Schuggs sought to have Section 16 rezoned, from "rural" to "transitional," a change that would allow construction of a higher-density housing development. Pinal County rejected the Schuggs' application to rezone Section 16.

Also in 2004, the Schuggs declared bankruptcy and listed Section 16 as their largest asset. G. Grant Lyon was appointed the Chapter 11 Trustee (Trustee) of the Schuggs' bankruptcy estates. During the bankruptcy proceedings, the Community filed a proof of claim asserting, of relevance here, that it had (1) "an exclusive right to use and occupy" Section 16, (2) "authority to impose zoning and water use restrictions" on Section 16, and (3) "a right to injunctive and other relief for trespass on reservation lands and lands to which it holds aboriginal title." In response, the Trustee initiated an adversary proceeding seeking a declaratory judgment that the Schuggs' estate had legal title and access to Section 16. The district court granted the Community's unopposed motion to withdraw the reference, thereby transferring the adversary proceeding to the district court.

In the district court, the Community moved to dismiss the case on the basis that the litigation should not proceed without the United States as a party. *See* Fed. R. Civ. P. 19. The district court denied the motion without prejudice to its renewal. The Community then filed an answer and counterclaims

against the Trustee. The Community alleged, as it had in its proof of claim, that it held aboriginal title to Section 16; that nonmembers had no right to cross Reservation land to access Section 16 and had therefore committed trespass to reach the parcel; and that it had authority to establish zoning and water use restrictions for Section 16. The Community sought declaratory and injunctive relief prohibiting the Schuggs from further trespass and compensatory damages for past trespasses.

On cross-motions for summary judgment, the district court granted the Trustee's motion in part, ruling that the Community did not hold aboriginal title to Section 16. It denied summary judgment on all other issues.

Following a bench trial, the district court issued findings of fact and conclusions of law. The district court held that the United States was not an indispensable party under Rule 19. The district court also determined that the Trustee had an implied easement over Smith-Enke Road to access Section 16. It further concluded that the Trustee had a right of access over Murphy Road, either because of an implied easement or because the relevant portion of the road was an Indian Reservation Road that must remain open for public use. The district court held, therefore, that the Schuggs had not trespassed on Reservation land. The district court rejected the Trustee's argument that it had a right to access Section 16 on the additional ground that Smith-Enke and Murphy Roads were public roads under Revised Statute 2477 (R.S. 2477), 43 U.S.C. § 932 (repealed 1976). Finally, addressing the Community's assertion of authority to control the zoning of Section 16, the district court held that the issue was not ripe for decision. The Community appeals from the district court's judgment regarding necessary and indispensable parties, the Trustee's rights of access to Section 16, and the rejection of the Community's assertions of aboriginal title and zoning authority over Section 16. The Trustee cross-appeals from the district court's judgment that Smith-Enke Road and Murphy Road are not public roads under R.S. 2477.

## II.

We first review the district court's determinations, under Rule 19, that this case could proceed without the United States or the individual Indian allottees of land abutting Section 16. We review a district court's decision regarding joinder for abuse of discretion, but we review legal conclusions underlying that decision de novo. *E.E.O.C. v. Peabody Western Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005).

A court first determines which parties must be joined under the criteria of Rule 19(a). *See* Fed. R. Civ. P. 19(a). Then, if a party that meets the criteria cannot be joined, the court must decide "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

The Community argues that the United States was a necessary party to the dispute over the Community's aboriginal title claim and the Trustee's alleged rights of access to Section 16. The Community further argues that, because the United States could not be joined due to sovereign immunity, the case should have been dismissed. Of course, the United States may be necessary as to some claims and not others. *See Makah Indian Tribe v. Verity*, 910 F.2d 555, 559 (9th Cir. 1990) (Indian tribes were necessary to some, but not all, claims asserted in the action). We first determine whether the United States was a necessary and indispensable party to the Community's aboriginal title claim. We then analyze whether the United States was a necessary and indispensable party to claims regarding the Trustee's rights of access.

### A.

**[1]** Aboriginal title is a "permissive right of occupancy granted by the federal government to the aboriginal possessors of the land." *United States v. Gemmill*, 535 F.2d 1145, 1147 (9th Cir. 1976). "It is mere possession not specifically

recognized as ownership . . . and may be extinguished by the federal government at any time," although such "extinguishment cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *Id.* (internal quotation marks and citations omitted). Whether a tribe has *aboriginal* title to occupy land is an inquiry entirely separate from the question of who holds *fee* title to land. Indeed, it is possible for a party to take title to land subject to an aboriginal right of occupancy. *See, e.g.*, *Beecher v. Wetherby*, 95 U.S. 517, 525-26 (1877) (federal government transferred fee "subject to" an aboriginal right of occupancy).

**[2]** With regard to the Community's claim of aboriginal title, we hold that the United States is not a necessary party under the criteria of Rule 19(a). The United States does not "claim[ ] an interest" in Section 16. The United States granted Section 16 to Arizona and has not since held it either in fee or as a trustee. Fee title to the *Reservation* land is held by the United States in trust for the Community, but Section 16 is not, and has never been, part of the Reservation. Thus, the United States has no interest in Section 16.

In addition, complete relief can be accorded among the existing parties without joining the United States. *See* Fed. R. Civ. P. 19(a). The Community's claim of aboriginal title is based on a theory that the federal government's transfer of Section 16 to Arizona (and hence to all subsequent owners) was *subject to* the Community's aboriginal title. The Community argues that its aboriginal title to Section 16 cannot be extinguished without the consent of the United States, and that the United States must be joined to obtain that consent. This premise is wrong. The district court did not purport to extinguish aboriginal title. Rather, the district court determined whether *Congress* had *already* extinguished the Community's aboriginal title. Joinder of the United States is not necessary to answer that question.

Because the United States is not required to be joined in order to adjudicate the Community's aboriginal title claims, we need not decide whether such claims can proceed without the United States under Rule 19(b). We also need not decide whether the United States has waived its sovereign immunity as to actions regarding aboriginal title.

**B.**

**[3]** We next determine whether the United States is necessary and indispensable to adjudication of claims regarding the Trustee's rights of access to Section 16. In this regard, the Trustee does not dispute the district court's conclusion that the United States should be joined as a necessary party under Rule 19(a). The United States holds legal title to the Reservation lands as a trustee for the Community, and any right of access to Section 16 must run over Reservation land. The United States therefore has an interest in the parties' right of way disputes because judicial recognition of an easement would impair the government's right. *Cf. United States v. Vascarajs*, 908 F.2d 443, 445-47 (9th Cir. 1990). If the claims regarding rights of access to Section 16 are resolved without the federal government's participation in this action, the result may "as a practical matter impair or impede the [government's] ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). Thus, the United States should be joined under Rule 19(a).

**[4]** The district court concluded, and the Trustee does not dispute, that the United States' joinder was impossible because it had not waived sovereign immunity. We therefore review "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

The Community argues that the United States is an indispensable party under *Minnesota v. United States*, 305 U.S. 382 (1939). There, the State of Minnesota sought to take by

condemnation a right-of-way for a highway over parcels of land that were part of a reservation and allotted to individual members of an Indian tribe. *Id.* at 383-84. The state named the United States, as holder of the fee in trust, as a defendant along with the individual allottees. *Id*. at 384. The United States moved to dismiss on the ground that, although it was a necessary party without which the case could not proceed, it could not be sued due to sovereign immunity. *Id*. The Court held:

> The United States is an indispensable party defendant to the condemnation proceedings. A proceeding against property in which the United States has an interest is a suit against the United States. It is confessedly the owner of the fee of the Indian allotted lands and holds the same in trust for the allottees. As the United States owns the fee of these parcels, the right of way cannot be condemned without making it a party. . . . The fee of the United States is not a dry legal title divorced from substantial powers and responsibilities with relation to the land. . . . In the stronger case of a trust allotment, it would seem clear that no effective relief can be given in a proceeding to which the United States is not a party and that the United States is therefore an indispensable party to any suit to establish or acquire an interest in the lands.

*Id*. at 386-87 & n.1 (internal citations omitted). *Minnesota* did not distinguish between attempts to create new interests in land and attempts to have pre-existing interests recognized. *See also Carlson v. Tulalip Tribes of Wash.*, 510 F.2d 1337, 1338-39 (9th Cir. 1975) (United States indispensable party to individuals' action to quite title to land claimed by Indian tribe as part of reservation).

**[5]** Although an action to establish an interest in Indian lands held by the United States in trust generally may not pro-

ceed without it, that rule does not apply where the *tribe* has filed the claim to protect its own interest. We recognized this exception in *Puyallup Indian Tribe v. Port of Tacoma*, 717 F.2d 1251 (9th Cir. 1983). In that case, a tribe claimed beneficial title to twelve acres of exposed riverbed, and sued the Port of Tacoma, which possessed and controlled the land at issue. The Port argued that the United States was a necessary and indispensable party, but we disagreed: "[T]he rule is clear in this Circuit and elsewhere that, in a suit by an Indian tribe to protect its interest in tribal lands, regardless of whether the United States is a necessary party under Rule 19(a), it is *not* an indispensable party in whose absence litigation cannot proceed under Rule 19(b)." *Id.* at 1254. We distinguished *Minnesota* and *Tulalip Tribes* on the basis that those cases were "instituted by non-Indians for the purpose of effecting the alienation of tribal or restricted lands, not by individual Indians or a tribe seeking to protect Indian land from alienation." *Id.* at 1255 n.1. We recognized that our holding was somewhat incongruous, but it was nevertheless our circuit's law: "Whether the Tribe is the plaintiff or the defendant in any given suit would not seem particularly relevant in a joinder decision under Rule 19(b), according to the factors set forth in the rule. We do not question, however, the distinction established in our circuit . . . for determining indispensability under Rule 19(b)." *Id.*; *see also Skokomish Indian Tribe v. France*, 269 F.2d 555, 556-57, 560 (9th Cir. 1959) (United States not indispensable party to trespass and quiet title action brought by Indian tribe).

**[6]** The Community argues that the Trustee was the aggressor in this litigation because he asserted title to Section 16 by listing it as a bankruptcy asset, and because he initiated the adversarial proceeding in bankruptcy court. For purposes of the *Puyallup* exception, however, we conclude that the Community effectively initiated this litigation by filing a proof of claim in the bankruptcy court contesting the Trustee's title and access rights to Section 16. It is true that the filing of a proof of claim does not make the claim "disputed" or

initiate an adversary proceeding. *See Lundell v. Anchor Constr. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) ("The filing of an objection to a proof of claim 'creates a dispute which is a contested matter' within the meaning of Bankruptcy Rule 9014 . . ."). But we agree with the district court: the Community "really stands in the shoes of a plaintiff" in this case. By filing a proof of claim asserting that the estate had no right to occupy or access its most significant asset, the Community "had to know that there would be an objection which could be litigated only as an adversary proceeding with [the Community] named as the defendant."

The Community argues that it was "forced" to "react[ ] defensively to protect its rights" by filing its proof of claim. The Trustee did not seek to alienate Section 16 from the Community, however: it simply listed what it believed was an asset of the Schuggs' bankruptcy estate. *Cf. In re G.I. Indus., Inc.*, 204 F.3d 1276, 1280 (9th Cir. 2000) ("By filing the proof of claim, Benedor voluntarily subjected the agreement [underlying the claim] to the bankruptcy court's jurisdiction . . . ."); *Bass v. Olson*, 378 F.2d 818, 820 & n.4 (9th Cir. 1967) ("[W]hen an adverse claimant comes into a bankruptcy court of his own motion for a determination of title to property, he . . . consents to the entry of an affirmative judgment in favor of the trustee."). Moreover, the Community's proof of claim challenged not only the Schuggs' rights in Section 16, but also asserted the Community's "exclusive right[s] to use and occupy Reservation lands surrounding" Section 16, asserted that the Community possessed authority to impose "zoning and water use restrictions" on Section 16, and sought relief for previous trespasses. Filing a proof of claim contesting the Schuggs' right to *occupy* Section 16 did not inherently raise issues regarding *access* to and *zoning* of Section 16. Such disputes were solely raised by the Community.

**[7]** In light of these several considerations, we hold that the *Puyallup* exception to the *Minnesota* rule applies here. This case is more similar to "a tribe seeking to protect Indian land

from alienation," such that the United States is not an indispensable party, than to a case of "litigation . . . instituted by non-Indians for the purpose of effecting the alienation of tribal or restricted lands." *Puyallup*, 717 F.2d at 1255 n.1. None of the specific Rule 19(b) factors suggests that we should carve out an exception to the *Puyallup* exception in this particular case. For example, the government's interests are shared and adequately represented by the Community. And this case presents significantly different circumstances than those in *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), which narrowly held that a particular suit could not go forward when it threatened to prejudice the interests of a foreign sovereign that had invoked sovereign immunity. *Id.* at 855. The United States is therefore not an indispensable party to this litigation under Rule 19(b).

## C.

The district court also concluded that individual Indian allottees of the land surrounding Section 16 were not required parties under Rule 19. The district court observed that the Community "offered only conclusory statements concerning the individual allottees' interest in this action." The district court also observed that, like the United States, the individual allottees were not bound by any judgment in this case. The Community disagrees, arguing that these individuals claim an interest relating to the subject of the action, and that this case will impair their ability to protect that interest.

[8] Assuming, without deciding, that the individual allottees were required parties under Rule 19(a), the litigation could proceed without them under Rule 19(b). The allottees' interests were adequately represented by the Community. There is no reason to believe that the Community did not make all of the arguments that would have been made by the individual allottees, or that the individuals "would offer any necessary element to the proceedings that the present parties

would neglect." *Washington v. Daley*, 173 F.3d 1158, 1167 (9th Cir. 1999) (internal quotation marks omitted).

## III.

We next turn to the district court's rulings on the merits. We review the district court's findings of fact for clear error, and review its conclusions of law de novo. *Adams v. United States*, 255 F.3d 787, 792-93 (9th Cir. 2001).

We first consider whether the district court erred in holding that the Trustee had an implied easement over reservation lands, across Smith-Enke Road and Murphy Road, in order to access Section 16. The district court concluded that when Section 16 was conveyed to Arizona as school land in 1877, an implied easement to access Section 16 was also conveyed. This implied easement, the district court determined, then passed to all subsequent owners of Section 16.

## A.

The Community first argues that the Trustee's claim to a common law easement is preempted by federal procedures for obtaining rights of way over Indian lands. Although these procedures were not created until after conveyance of the alleged easement in 1877, the Community urges that preemption applies to the claim of the easement now asserted. But nothing in the scheme indicates that Congress, in creating procedures for obtaining *new* rights of way, intended to preempt all claims to *previously acquired* rights of way, such that holders of pre-existing easements would have to go through the new procedures.

To support its preemption argument, the Community relies on *Adams v. United States*, 3 F.3d 1254 (9th Cir. 1993); *Adams*, 255 F.3d at 787; and *Fitzgerald Living Trust v. United States*, 460 F.3d 1259 (9th Cir. 2006). These three cases concerned landowners who claimed easements through national

forests. They are of little help here because they dealt with an entirely different statutory scheme under which landowners whose property was surrounded by national forests were *guaranteed* reasonable access over federal land and therefore did not need a common-law easement to cross it. Even there, the presence of a preexisting common-law easement is relevant to whether regulations governing access are reasonable. *See Fitzgerald*, 460 F.3d at 1263-64.

[9] We hold that the Trustee's claim of a pre-existing easement to access Section 16 is not preempted by the existence of a regulatory scheme for obtaining new easements over Indian lands.

**B.**

We turn now to the merits of the Trustee's right-of-access claims. The Trustee argued that an implied easement gave the Schuggs a right to cross Reservation land in order to enter Section 16. The district court agreed, holding that, "when Section 16 was conveyed as school land to the then Territory of Arizona, an implied easement to the land also was conveyed," and the implied easement was conveyed to all subsequent purchasers, including the Schuggs.

[10] We first examine whether the federal government's conveyance of Section 16 to Arizona, as part of a school land grant, included an implied easement. Courts normally construe federal land grants narrowly, under a longstanding "rule that unless the language in a land grant is clear and explicit, the grant will be construed to favor the [granting] government so that nothing passes by implication." *Fitzgerald*, 460 F.3d at 1265; *see also McFarland v. Kempthorne*, 545 F.3d 1106, 1112 (9th Cir. 2008). However, there is an exception to this general rule where the land grant at issue was made pursuant to "legislation of Congress designed to aid the common schools of the states;" in such cases, the grants are "to be construed liberally rather than restrictively." *Wyoming v. United*

*States*, 255 U.S. 489, 508 (1921); *see also Oregon v. Bureau of Land Mgmt.*, 876 F.2d 1419, 1432 (9th Cir. 1989).

It is true that the statute conveying Section 16 to Arizona mentions no easement or right of access. But the question is whether the district court properly held there was an *implied* one. *Utah v. Andrus* dealt with a land grant to Utah by the United States on the condition that Utah "use the proceeds of the granted lands for a permanent state school trust fund." 486 F. Supp. 995, 1000 (D. Utah 1979). The land so granted was surrounded by federal land. Many years later, Utah leased the land to a company that wished to mine it but could not do so without crossing federal land. The district court held:

> Given the rule of liberal construction [of school land grants] and the Congressional intent of enabling the state to use the school lands as a means of generating revenue, the court must conclude that Congress intended that Utah (or its lessees) have access to the school lands. Unless a right of access is inferred, the very purpose of the school trust lands would fail. Without access the state could not develop the trust lands in any fashion and they would become economically worthless. This Congress did not intend. . . . Therefore, the court holds that the state of Utah and . . . Utah's lessee do have the right to cross federal land to reach section 36, which is a portion of the school trust lands.

*Id.* at 1002.

**[11]** This reasoning is persuasive: In granting lands to a state for the purpose of funding schools, the federal government must have intended some right of access to the land or the purpose of the land grants would fail. Thus, in *Koniag, Inc. v. Koncor Forest Resource*, we similarly implied a right of reasonable access. 39 F.3d 991, 996 (9th Cir. 1994). In *Koniag*, a partnership made up of Indian villages owned sur-

face rights to harvest timber pursuant to a grant from the United States, while the subsurface rights were owned by a regional corporation. We held that the Indian partnership had a reasonable right to use the subsurface rock to accomplish its timber-harvesting operations. In reaching this conclusion, we examined "several factors, including congressional intent, the degree of necessity for the easement, whether consideration was given for the land, whether the claim is against the United States or against a simultaneous conveyee, and the terms of the patent itself." *Id.* Here, Congress's intent in granting Section 16 to Arizona was to allow Arizona to use or to sell the parcel to raise money for the support of public schools. The property would have had little monetary value if there was no right of access to it.

The Community argues that we should not follow the reasoning of *Andrus* because there the right of access was implied over federal wilderness land, not across Indian land. The Community argues that no right of access should be implied over Indian land pursuant to the "principle deeply rooted in [the Supreme] Court's Indian jurisprudence: statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992) (internal quotation marks and alteration omitted). The Community urges that any diminishment of rights in their land must be accomplished by language showing an "express congressional purpose" to do so. *Solem v. Bartlett*, 465 U.S. 463, 475 (1984).

**[12]** The Community's argument ignores the fact that in 1877, when the federal government granted Section 16 to Arizona, *the lands surrounding Section 16 were not Indian lands*. The Community's Reservation, as created in 1859, did not abut Section 16. Land north of Section 16 was added to the Reservation in 1883, and land to the south, east, and west of Section 16 was added to the Reservation in 1913. Thus, when the federal government granted Section 16 to Arizona in

1877, an implied easement accompanying the grant would *not* have interfered with Indian land at all. Section 16 was not surrounded by Indian lands until 1913, pursuant to an executive order specifically providing that the expansion "shall be subject to any existing valid rights of any persons to the lands described." By this language, any pre-existing easements were effectively preserved, including the pre-existing implied easement to access Section 16. We hold, therefore, that the district court properly implied an easement in the federal government's grant of Section 16 to Arizona, and that easement was not disturbed by the subsequent expansion of the Reservation.

**[13]** The Community alternatively argues that even if an implied easement was created in 1877 for the benefit of Arizona, it would not have "silently" passed to subsequent purchasers of Section 16. But the deed transferring Section 16 from Arizona to J.L. Hodges in 1929—more than a decade after the land became surrounded by the Reservation—clearly specified that the purchaser received "all the rights, privileges, immunities and appurtenances of whatsoever nature." We have held that "the word 'appurtenance' will carry with it an existing easement." *Fitzgerald*, 460 F.3d at 1267. Subsequent deeds transferring Section 16 contained similar language. We therefore hold that the implied easement Arizona obtained from the federal government in 1877 was effectively conveyed to each subsequent purchaser of Section 16.

## C.

The Trustee asked the district court to opine on the scope of any easement. The district court held that there was no actual controversy regarding the scope of the Trustees' easement, and properly declined to issue an advisory opinion on that subject. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992).

The Trustee has not shown that there is a live controversy with regard to the *scope* of any easement. There is no indica-

tion that the roads or utilities as they currently exist are inadequate to support the current use of Section 16, or that the Trustee has any intent to improve the roads or utilities. The parties may disagree in principle over what activities the Trustee may undertake on those roads, but there is as yet no particularized or imminent injury arising out of that disagreement.

## IV.

The district court held that, in addition to or as an alternative to the implied easement, the Trustee has a right to access Section 16 across Murphy Road because that road was an Indian Reservation Road (IRR) open to the public. The district court observed that the Community had maintained the road and allowed public travel on it for many years, such that the owners of Section 16 came to rely on it. The district court concluded that the doctrine of laches barred the Community from arguing that the relevant section of Murphy Road was not an IRR open to the public.

## A.

**[14]** An IRR is defined as "a public road that is located within or provides access to an Indian reservation" or other Indian land. 23 U.S.C. § 101(a)(12). A "public road," in turn, is "any road or street under the jurisdiction of and maintained by a public authority and open to public travel." *Id.* § 101(a)(27). A "public authority" may include a federal, state or municipal government or instrumentality, or an Indian tribe. *Id.* § 101(a)(23). IRRs generally must be open and available for public use. 25 C.F.R. § 170.120. "Certain IRR transportation facilities [a term that includes public roads, 25 C.F.R. § 170.5] owned by the tribes or BIA [Bureau of Indian Affairs] may be permanently closed when the tribal government and the Secretary agree. Once this agreement is reached, BIA must remove the facility from the IRR System." *Id.* at

§ 170.813(c). The "IRR System means all the roads and bridges that comprise the IRR." *Id.* at § 170.5.

Here, the Community argues that the part of Murphy Road running across Reservation land is neither publicly maintained nor open to the public. It submits that it once maintained the section of Murphy Road at issue, but stopped doing so when the BIA removed that section of road from the "IRR Inventory" in early 2007. "The IRR Inventory is a comprehensive database of all transportation facilities eligible for IRR Program funding . . . ." 25 C.F.R. § 170.442(a). The Community also asserts that the BIA approved its posting of "No Trespassing" signs on the road. It unsuccessfully attempted to introduce evidence in the district court about the BIA's removal of the relevant section of Murphy Road from the IRR Inventory. The district court excluded the evidence on multiple grounds. The Community also moved for judicial notice of the BIA's action, but that motion was denied.

**[15]** We hold that the district court erred in refusing to take judicial notice of this official action by the BIA, which represents the BIA's opinion that Murphy Road is not an IRR. Courts may take judicial notice of facts whose "existence is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' " *W. Radio Servs. Co. v. Qwest Corp.*, 530 F.3d 1186, 1192 n.4 (9th Cir. 2008). It must be taken when a party requests it and supplies all necessary information. Fed. R. Evid. 201(d); *cf. Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 924 n.3 (9th Cir. 2002) ("Although that decision is still subject to further administrative and judicial review, and therefore not finally dispositive of any issue in the case, the existence of the ongoing litigation within FERC is an adjudicative fact relevant to this case. Further, the existence of the opinion is not in dispute, nor are its contents. Therefore, we take judicial notice of the entirety of [the decision]") (internal citations omitted). The Trustee does not allege that it would be prejudiced by the court's taking of judicial notice of the

BIA's action. Indeed, the Trustee was informed of the BIA's decision "in a matter of days" after it was made, and has apparently appealed the BIA decision.

The district court's decision also conflicts with the primary jurisdiction doctrine, which applies when "an otherwise cognizable claim implicates technical and policy questions that should be addressed in the first instance by the agency with regulatory authority over the relevant industry rather than by the judicial branch." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). This doctrine "is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit," but should be used "if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Id.* (internal quotation marks and citations omitted).

**[16]** We conclude that the district court should not have ignored the BIA's removal of the relevant portion of Murphy Road from the IRR Inventory. Instead, the district court should have at least stayed its decision pending ongoing BIA proceedings on the issue. *See Clark*, 523 F.3d at 1114-15. BIA proceedings on the issue are apparently ongoing. The BIA's initial decision that the relevant portion of Murphy Road should not be included in the IRR Inventory is on appeal to the Interior Board of Indian Appeals. The IRR system is administered by the BIA under a detailed regulatory scheme, and uniformity is important. We therefore vacate and remand this issue to the district court for further consideration.

**[17]** There is a related issue that we should review in order to guide the district court on remand: the application of laches. The district court held that, because the Community had allowed public access to Murphy Road and maintained

the road for many years, the doctrine of laches precluded the Community from now disclaiming that Murphy Road is an IRR. "Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *United States v. Dang*, 488 F.3d 1135, 1144 (9th Cir. 2007) (internal quotation marks omitted). Prejudice typically means that evidence is no longer available or that the party asserting laches has "altered its [behavior] in reliance on a plaintiff's inaction." *Wauchope v. U.S. Dep't of State*, 985 F.2d 1407, 1412 (9th Cir. 1993). Here, the Trustee asserts that Section 16 owners, and particularly the Schuggs, have relied on the Community's treatment of Murphy Road as an IRR. That reliance was not reasonable, however, given that the regulations governing IRRs *explicitly contemplate* that a road may be closed to the public upon the agreement of the tribe and the BIA. 25 C.F.R. § 170.813. There is also no evidence that the Schuggs were relying on the road's status as an IRR rather than on the implied easement the district court found to exist. We therefore hold that the district court erred in applying laches to conclude that a section of Murphy Road is an IRR.

## V.

**[18]** The Trustee cross-appeals from the district court's holding that Smith-Enke Road and Murphy Road, which provide access to Section 16, are not public roads under R.S. 2477. Prior to its repeal in 1976, R.S. 2477 authorized rights-of-way for the construction of highways over public lands not reserved for public uses. 43 U.S.C. § 932 (repealed 1976). The law repealing R.S. 2477 expressly preserved any valid, existing right-of-way. *See Adams*, 3 F.3d at 1258. The question is therefore whether Smith-Enke Road and Murphy Road were valid R.S. 2477 roads in 1976.

## A.

We must first address the Community's arguments that the district court lacked jurisdiction to decide this issue. The

Community argues that the Trustee's R.S. 2477 claim is essentially an action to quiet title to lands held by the United States. The Community points out that such an action may only be brought under the Quiet Title Act, which expressly preserves the federal government's sovereign immunity with respect to claims regarding Indian lands held in trust by the United States. 28 U.S.C. § 2409a(a).

The Trustee's R.S. 2477 argument is not effectively an action to quiet title. The Trustee is not seeking a declaration against the United States. He does not contest the federal government's "title" to the roads or claim a property interest in them. Rather, the Trustee seeks only a declaration against the Community that he has legal access to Section 16, which will not bind the United States.

The Community next argues that the Trustee does not have Article III "standing to assert the public's collective right to use a road under R.S. 2477" because he has no more particularized interest than any other member of the public. To have standing, the Trustee must have a "concrete and particularized" injury that is more than a "mere generalized grievance." *Alaska Right to Life PAC v. Feldman*, 504 F.3d 840, 848-49 (9th Cir. 2007). But here, the Trustee has not attempted to obtain a general declaration against the United States regarding whether Murphy Road and Smith-Enke Road are R.S. 2477 roads. Rather, he simply seeks a declaration that will bind the Community, to defeat its assertion that the Schuggs have been trespassing on Reservation land. The "threat of liability for civil or criminal trespass constitutes the type of injury that . . . is both 'concrete and particularized,' and 'actual or imminent' " for purposes of standing. *Dixon v. Edwards*, 290 F.3d 699, 712 (4th Cir. 2002).

**B.**

**[19]** Moving to the merits of the issue, it is the Trustee's burden to establish the existence of an R.S. 2477 route. *Shultz*

*v. Dep't of Army*, 96 F.3d 1222, 1223 (9th Cir. 1996). Federal Revised Statute 2477 did not itself *create* R.S. 2477 roads; rather, it *authorized* the states to construct highways over public lands. Thus, for Murphy Road and Smith-Enke Road to be R.S. 2477 roads, Arizona had to establish them as highways over public land in accordance with Arizona state law. *See Standage Ventures, Inc. v. Arizona*, 499 F.2d 248, 250 (9th Cir. 1974) (explaining that right of way under R.S. 2477 comes into existence "automatically *when a public highway [is] established across public lands in accordance with the law of the state*") (emphasis added). R.S. 2477 acts "as a present grant which takes effect as soon as it is accepted by the State," and acceptance requires merely "some positive act on the part of the appropriate public authorities of the state, clearly manifesting an intention to accept." *Wilderness Soc'y v. Morton*, 479 F.2d 842, 882 (D.C. Cir. 1973) (internal quotation marks omitted). Thus, the first question is whether Arizona at some point established these roads as public highways under Arizona law and if so, whether these roads crossed lands that were "public lands" at that time.

## 1.

As to the first question, the Trustee urges that there is evidence that a road existed in the general location of present-day Smith-Enke Road since at least 1913, and a road in the general location of present-day Murphy Road since at least 1875. The mere existence of these roads is not enough to make them "public highways," however. Rather, Arizona must have taken some affirmative act to accept the grant represented by R.S. 2477. *See id.*

[20] The Trustee points to a declaration by Pinal County in 1922 that public roads ran along all section lines in the region. Because Smith-Enke Road and Murphy Road were aligned with section lines, the Trustee argues that the 1922 declaration made these roads into public highways under Arizona law. We will assume without deciding that Pinal County's 1922

declaration was a sufficient governmental action to create state "highways," which eventually became present-day Murphy Road and Smith-Enke Road. We will also assume without deciding that Arizona thereby took sufficient action to accept the grant of an R.S. 2477 right of way.

**2.**

**[21]** The question then becomes whether, in 1922, those "highways" ran across "public land." This is where the Trustee's argument fails. It is undisputed that a 1913 executive order expanded the Community's Reservation to completely surround Section 16. The district court therefore concluded that, at the time of Pinal County's 1922 declaration, Murphy Road and Smith-Enke Road ran across land that had become part of the Reservation and therefore lost its public character.

**[22]** The Trustee's reply is a counterintuitive proposition: that the Reservation land added by executive order was somehow still "public land." The Trustee's argument invokes a distinction between the creation or expansion of a reservation by executive order and by an act of Congress. The Trustee asserts that Indian reservation boundaries set by executive order may be modified by Congress at any time, and that Congress need not compensate Indian tribes for reducing a reservation expanded by executive order. The Trustee relies on *Sioux Tribe of Indians v. United States*, which held that an Indian tribe was not entitled to compensation upon the abolition of a reservation established by executive order, although a tribe would be entitled to compensation upon the abolition of a reservation established by Congress. 316 U.S. 317 (1942). But the Supreme Court recognized in *Sioux Tribe of Indians v. United States* that it still "lay within the power of the President to withdraw lands from the public domain." 316 U.S. 317, 325 (1942). Executive and congressional reservation grants may differ as to whether a tribe is entitled to compensation in the event of revocation, but that does not change the fact that "the executive orders . . . involved here were

effective to withdraw the lands in question from the public domain." *Id*.; *see also Id.* at 326, 331. Accordingly, the relevant lands in this case were removed from the public domain by the executive order expanding the Community's Reservation.

**[23]** We hold that the Trustee failed to show that Arizona established Smith-Enke Road and Murphy Road as public highways crossing public land. They are not R.S. 2477 roads.

## VI.

We now turn to the Community's claim of aboriginal title to Section 16. The district court held that any aboriginal title held by the Community to Section 16 was extinguished in 1877 when the federal government conveyed Section 16 to Arizona. The court concluded that because Section 16 was granted to Arizona "for the 'support of common schools,' " it followed "that Congress would not intend the land, to be used as a revenue generator, to be burdened with a superior right of use and occupancy such as aboriginal title."

The Community argues that aboriginal title can only be extinguished through an unambiguous action and should not have been implied here, because the school land grant was silent on the issue. The Community cites cases in which the Supreme Court has held that school land conveyances vest the fee in the state *subject to* any aboriginal title. These cases are distinguishable because they involved situations where a pre-existing *treaty* had preserved the aboriginal title. *See United States v. Thomas*, 151 U.S. 577, 584 (1894) (holding that "*by virtue of the treaty* . . . the title and right which the state may claim ultimately to the sixteenth section of every township for the use of schools is subordinate to this right of occupancy of the Indians." (emphasis added)); *Wisconsin v. Hitchcock*, 201 U.S. 202, 213-15 (1906); *Beecher*, 95 U.S. at 525.

**[24]** The Community protests that there is no rationale for a distinction between an Indian tribe's right of possession pur-

suant to a treaty (as in *Beecher*, *Thomas* and *Hitchcock*) and an Indian tribe's right of possession pursuant only to aboriginal title. But the rationale in those cases is that the Indian tribe's right of possession gained by treaty is akin to a contract right negotiated in exchange for some valuable consideration and not subject to unilateral revocation by the federal government. Here there was no such right of possession when Section 16 was conveyed to Arizona in exchange for some valuable consideration. In this case, at the time that Section 16 was conveyed to Arizona, the Community had no such *recognized* right of possession.

**[25]** The district court thus correctly held that the conveyance extinguished the Community's aboriginal title to Section 16. *Accord Gemmill*, 535 F.2d at 1147-49 (series of federal actions "clearly demonstrate[d]" title extinguished).

Because we hold that the Community's aboriginal title was extinguished in 1877, we need not reach the Trustee's alternative argument that the Community is collaterally estopped from asserting aboriginal title because the Indian Claims Commission already determined that the Community's aboriginal title had been extinguished and awarded compensation to the Community for the loss of that title.

## VII.

We have now determined that the Trustee had a valid right of access to Section 16, and that the Community's aboriginal title to Section 16 has been extinguished. The parties raise one final question: does the Community have zoning authority to prevent future residential development of Section 16? The district court correctly found that the issue was not ripe for decision. *See Cal. ex rel. Lockyer v. United States Dept. of Agriculture*, 575 F.3d 999, 1011 (9th Cir. 2009).

The record before us shows that the possibility that Section 16 might be developed as a housing subdivision is speculative

at this time. Pinal County has refused to alter the zoning of Section 16 to allow such a development, and there are no current plans to sell Section 16 to a developer or to construct a housing development on Section 16. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citation omitted); *see also Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009). We have no opportunity to address the claim on its merits, or to review the district court's alternative holdings.

**AFFIRMED in Part; Vacated and Remanded in Part. Each party shall bear its own costs.**