IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

GAMBLE LAND & TIMBER, LTD., )
a Washington limited partnership; and )      No. 37297-9-III
CASCADE HOLDINGS GROUP, LP, )
a Nevada limited partnership, )
)
Appellants, )
)      UNPUBLISHED OPINION
v. )
)
OKANOGAN COUNTY, a Washington )
Municipal Corporation; and all other )
persons or parties unknown claiming right, )
title, estate, lien, or interest in the real )
estate described in the Complaint herein, )
)
Respondent, )
)
and )
)
OKANOGAN OPEN ROADS )
COALITION, and individual taxpayer )
members thereof LORAH SUPER, )
CRAIG OLSON, AND KEVIN )
CREAGER; and STATE OF )
WASHINGTON, *Ex Relatione* LORAH )
SUPER, CRAIG OLSON, AND KEVIN )
CREAGER, )
)
Respondents and )
Cross Appellants. )

SIDDOWAY, J. — In 1993 and 1994 Gamble Land & Timber, Ltd. and Cascade Holdings Group, LP, both limited partnerships (hereafter "the Partnerships"), acquired properties in a mountainous region in Okanogan County (County) generally northwest of Methow. The properties are used by the Partnerships for grazing and timber production. Some of the Partnerships' property is located north and some is located south of more than 1,600 acres of public land owned by the Department of Natural Resources (DNR).

A several mile section of a primitive road running through the DNR land traverses the Partnerships' properties to the north and south. Decades ago that segment was gated on both ends by the Partnerships' predecessors in interest. The Partnerships maintain that the gated roadway was privately constructed and is privately owned.

In 1955, Okanogan County's Board of County Commissioners (BOCC) adopted an official county road map that included the roadway traversing the Partnerships and DNR land as a county road. Three times thereafter, the Partnerships or their predecessors petitioned the County to vacate the gated segment. The BOCC denied the petition to vacate each time, although the third time, after being threatened by the Partnerships with litigation, it withdrew its denial and demurred on whether the County owned the gated segment.

Following continuing "trespasses" by the public thereafter, the Partnerships brought this quiet title action to establish title to the gated segment. In the course of discovery, the County, for the first time, located records from 1889 that evidence action

by its territorial board of county commissioners to open the "Methow Valley Road," of which the now-gated segment appeared to be a portion. Those records, and surveys from 1890 to 1905, evidence the establishment and use of a road that two surveyors have opined reliably conforms to the existing roadway, including the gated segment.

The trial court rejected the argument of an intervenor, the Okanogan Open Roads Coalition, that it lacked subject matter jurisdiction over the quiet title action. But it granted the intervenor's motion for summary judgment against the Partnerships. Cross appeals were filed. We reject both appeals and affirm the trial court.

FACTS AND PROCEDURAL BACKGROUND

In March 2017, the Partnerships filed a complaint to quiet title to "French Creek Road." Clerk's Papers (CP) at 24-25. Named as defendants were Okanogan County and "all other persons or parties unknown claiming any right, title, estate, lien, or interest" in the subject real estate. CP at 21. Read as a whole, the complaint sought to quiet title to a 3.64 mile segment of what was by then called French Creek Road. The segment traverses the Partnerships' properties and the DNR property between them, and has long had private gates at both ends. Attached to the complaint was a rough depiction of the 3.64 mile section, its relation to the Partnerships and DNR properties, and the gates:

3



CP at 31 (shading added).

The complaint acknowledged that the Okanogan County BOCC adopted an official county road map in September 1955 that included as county roads what were then called roads Nos. 51 (French Creek–Texas Creek) and 91 (Watson Draw–French Creek). It complained that the County took this action without paying any compensation to the French Creek Road landowners and without following any of the "proper statutory procedures for acquiring title." CP at 24. It alleged that French Creek Road was built by the Partnerships or their predecessors and had been maintained by them, none of whom ever dedicated or took action evidencing an intent to dedicate the road to the County. It alleged that locks had been used on private gates on the road, in one case for at least 40

4

years, and in another case, since 2009. It alleged that any public access had been with their permission. Finally, it alleged that the BOCC had "disclaimed 'any interest or jurisdiction'" over the road in 2009. CP at 26.

The County answered and soon amended its answer to the complaint. While both County answers asked the superior court to deny the relief requested by the Partnerships, the amended answer was more neutral on some matters alleged by the complaint. Concerned about the County's new position, the Okanogan Open Roads Coalition and three of its taxpayer members (collectively, "the Coalition") intervened and filed an answer and counterclaims. The Coalition alleged the County had established the road and the public had used it as early as 1888. In a cross claim and counterclaim, it alleged that a County disclaimer of the public's interest in the gated segment was unlawful absent compliance with provisions of Title 36 RCW, and the Partnerships' private gates were an unlawful obstruction in violation of RCW 7.48.140.

The result of a first round of cross motions for partial summary judgment by the Partnerships and the Coalition (the County remained neutral) was a partial victory for the Partnerships. The trial court granted partial summary judgment to the Partnerships on the basis that the "County has never established the disputed roadway as a County Road by dedication, petition, or condemnation." CP at 1566. It ruled that a dispute of fact remained whether the gated segment of the road was public as a result of prescriptive use.

5

In discovery that followed, the County located historical records not previously known to the Coalition. Based on those records and on expert testimony provided by licensed surveyors and a historian, the Coalition again moved for summary judgment. Relying on the reasoning of a then-recent Montana Supreme Court decision, the Coalition also argued that the quiet title action should be dismissed for lack of subject matter jurisdiction.

This time the County supported the Coalition's argument that the gated segment was demonstrably a public road.

### THE SECOND ROUND OF CROSS MOTIONS AND THE ENLARGED RECORD

*Lack of subject matter jurisdiction*

The Coalition led with its motion asking the court to dismiss the quiet title action for lack of subject matter jurisdiction. It argued that the Partnerships and their predecessors subjected themselves to the exclusive jurisdiction of the BOCC by asking it to vacate French Creek Road, and were bound by the BOCC's adverse decisions.

In support of the Coalition's motion, the Coalition and the County presented evidence that the Partnerships and their predecessors knew or had notice for more than half a century that the road was viewed by the County as public. The County presented a copy of its official county road map published in 1955 that its public works department had marked with the current names of the roads (French Creek, Texas Creek and Watson Draw Roads) and the Partnerships' gate locations:

6



CP at 565.

Evidence was presented that in 1955, Charley Judd, a prior owner of the Partnerships' property north of the DNR property, petitioned to vacate part of Texas Creek Road. His petition was denied by the BOCC.

In 1965, there was a second effort to have the County vacate Texas Creek-French Creek Road. The O'Tooles, prior owners of the Partnerships' property south of the DNR property, were among those signing the petition. The county engineer reported to the BOCC in connection with the 1965 petition that the road was "of a generally low

7

standard, but easily traveled by passenger car" and commented that there were three illegal gates across it. CP at 139. He said the road accessed tracts of state land and "carries little traffic at most times, but is extensively used during hunting season." *Id.* More than 150 people signed petitions opposing vacation. DNR also opposed vacation, stating as reasons that access was needed for resource management and fire control purposes and "[t]o provide access to recreationists, hunters, campers, fisherman, etc. to the public lands," of which the State "owns approximately 6,000 acres." CP at 160. Following a visit to the area in June 1965, the commissioners, "considering the opposition to vacation by private citizens and government agencies . . . unanimously decided that Road #51 (French–Texas Creek) in the matter of vacating would have to be denied in the public interest." CP at 135.[1]

In July 1969, several community members appeared before the BOCC and asked that the County reopen French Creek Road, which they reported was blocked at the Rodney O'Toole home. The assistant prosecuting attorney advised the commissioners that it was a public road that could not be blocked. On motion and a unanimous vote, the BOCC instructed its attorney to write to O'Toole informing him that he had five days to remove the obstruction. It resolved that on day six, the county grader would grade the road.

---

[1] The historical documents, mostly handwritten, exhibit remarkable penmanship by today's standards, but the copy quality is sometimes poor. We rely in some cases on a document's unchallenged construction by a witness or a party.

Evidence was presented that in February 2008, a senior engineer technician from the County's Department of Public Works wrote to one of the Partnerships' principals to say that a gate crossing French Creek Road, which the County was informed belonged to his operation, "is, in our opinion, crossing a public road as therefore probably an illegal obstruction." CP at 1910. The letter asked him to remove the private gate, since the County needed to keep the road open for public use. It suggested that if "there is a need that it be vacated . . . you petition the County Commissioners for such an action." *Id.*

Evidence was presented that a few months later, in May, the County Department of Public Works received a request for service from "Matt Marsh /DNR" that "[t]here is a gate across the county road [at] 3.62 [milepost]" and that DNR wanted the gate removed, along with a skidder in the roadway, so that it could access its property. CP at 1912.

Evidence was presented of a 2009 petition to vacate that was submitted by the Partnerships and a third party. The petition stated that the road had been "gated, locked, and unusable as a public road since the early 1960s." CP at 386. Attached to the petition were photographs of the road that showed its rustic condition and lack of maintenance.

On November 16, 2009, the BOCC concluded its public hearing on the petition. Its minutes reflect that after observing that "the road appears to be very important to the citizens," Commissioner Don Hover

> moved to deny the vacation of a portion of French Creek Road and ordered all obstructions on the road be removed within the week. Motion was seconded and carried.

9

CP at 501.

From this history, the Coalition argued that since the Partnerships and their predecessors voluntarily sought vacation of the road by the BOCC, its only avenue for redress had been to appeal the denials. Since they had not, the Coalition argued, the superior court lacked jurisdiction to entertain the Partnerships' quiet title action.

The Partnerships responded that the Montana Supreme Court decision on which the Coalition relied was not binding. They argued that it also was not persuasive, since it involved a distinguishable fact: the Ravalli County Commissioners had not reversed their decision, and the Partnerships argued that in the case of their 2009 petition, the BOCC denial *was* reversed. Evidence was presented that the day after the BOCC denied the 2009 petition to vacate, a lawyer for the petitioners sent an e-mail to a County prosecutor describing problems that would befall the County if the road was opened. The e-mail stated that the petitioners would be "filing to quiet title to the roadway in question." CP at 376. At a BOCC meeting on November 24, a representative of the public works department informed the commissioners that the prosecutor recommended modifying denial of the petition "indicating we don't have a claim to the portion north of [the gate]." CP at 377. The minutes reflect reluctance on the part of Commissioner Mary Lou Peterson to revisit the vote, but the minutes go onto report the prosecutor's warning that "[i]f [petitioners] file and matters go to trial it could cost the county much money." *Id.*

Commissioner Hover expressed a wish to discuss it further and take more time to think about it.

A week later, Commissioners Hover and Andrew Lampe directed the prosecutor to prepare a resolution "narrowing" its earlier decision denying the petition. CP at 378. A week after that, Resolution 443-2009 was adopted and stated in relevant part that with regard to a portion of the road, "including the gated portion,"

> [t]he records and documents held by the County do not support that that portion of the road is a county road or public right of way and, therefore, does not claim any interest or jurisdiction over that portion of the Road. *Therefore, there was no interest to vacate, or not vacate*, and that portion of the decision is rendered null and void. Furthermore, as the gated portion of the road lies outside the County's jurisdiction, any order to remove or open the gate is rendered null and void.

CP at 379-80 (emphasis added).

Given this alleged reversal, the Partnerships argued they had nothing to appeal in 2009. They also argued that the quiet title action they filed in 2017 was not an attempt to relitigate its 2009 petition; it was filed years later, to address a trespassing problem.

> *Renewed argument that there was no genuine material dispute that the Methow Valley Road became a public road by virtue of petition and public use*

The Coalition's alternative argument was that newly located evidence established that the Methow Valley Road was surveyed and opened by Okanogan County in 1889 in response to a petition, and was used as a primary access route to the valley in the ensuing decades, thereby becoming a county road by petition and public use.

The Coalition had previously relied on some historical evidence. It alleged in answering the quiet title complaint that United States Geological Survey (USGS) surveys prepared between 1897 and 1903 depicted French Creek, Texas Creek and Watson Draw Roads in essentially the same place as they exist today. It alleged that the Surveyor General's 1903 cadastral survey of the township and range within which the three roads are located showed the existence of the roads, on public land. The Coalition also relied in answering the complaint on resolutions of Okanogan's BOCC in 1903 and 1910 holding as public highways all roads (and in 1910, all "wagon roads, trails, footways and bridleways"), whether worked by the County or not. CP at 7, 9. But despite public record requests and discovery, the Coalition had no proof at the time of the first summary judgment motions that the BOCC had been petitioned or had established the road.

Among newly located evidence on which the Coalition now relied were documents that Josh Thomson, the Okanogan County Engineer, found in April 2019 in an historic road file in the County's public works department. Included in the file were a handwritten petition to the BOCC signed by 34 individuals, and a "notice that petition will be presented," both dated March 27, 1889. CP at 224-25, 211 (capitalization omitted). The documents gave notice that a petition would be presented to the BOCC at its next regular term, asking for the location of a County road described as follows:

> *Commencing at a point on the Columbia river about two miles above the*
> *mouth of the Methow River and Running on the most practical route to the*
> *ranch of Alex Watson from thence to the ranch of Silas W. Cheval on French*

12

> *Creek from thence to the summit of the mountain west thence down a creek called Texas Creek to the ranch of Mr. Sumpter thence up the East side of the Methow River to a place known as the forks of the Methow.*

CP at 211.

The newly-located file included a handwritten "petition and prayer in remonstrance"[2] addressed to the county commissioners, dated April 7, 1889, expressing the signatories' opposition to the March 27 petition. CP at 214-15. The remonstrance acknowledged that over 100 people in the upper Methow Valley were "virtually shut out from all communication with the outside world rough ranges of mountains attaining high altitude and thickly studded with timber intervening between them and the Columbia River," but criticized the route proposed by the petition as even more difficult than routes proposed but abandoned in the past. CP at 214-15.

The file included a "report of road viewers" signed by two viewers and the surveyor, addressed to the BOCC. It recited their appointment at the BOCC's May 1889 term "to view and locate" the proposed road and "presented the following report":

> We met on the _12th_ day of _May_ 188_9,_ and after having been sworn by _Frank. M. Baum_ to faithfully and impartially discharge the duties of our appointment, we took to our assistance [*handwritten names, insufficiently legible*] two suitable persons as chain bearers, and [*handwritten names, insufficiently legible*] as marker *and* [*illegible*] and proceeded to the place

---

[2] *Black's Law Dictionary* 1549 (11th ed. 2019) defines "remonstrance" as meaning

1. A presentation of reasons for opposition or grievance. 2. A formal document stating reasons for opposition or grievance. 3. A formal complaint or protest against governmental policy, actions, or officials.

of beginning of said road as designated in your order and viewed, surveyed and laid out said road as directed, as near as in our opinion a good road can be made, at a reasonable expense. For a full and complete description of our work we refer you to the field notes, survey and plat of said road, presented herewith by the surveyor. Our opinions are in favor of the establishment of the said road, for the following reasons:

*That it is the only road that can be constructed with the resources at hand.*

CP at 218. Frank M. Baum was then the county auditor.

The file included a "surveyor's return and certificate" addressed to the BOCC that was dated June 1, 1889, and was signed by Henry Carr, surveyor. CP at 220 (capitalization omitted). It recited his appointment at the BOCC's May 1889 session as surveyor, to survey the proposed road, and certified

that the following is a true and correct return of the survey of said road as made by me under the direction of the viewers, to-wit:

*See field notes*

and that herewith is a correct plat of said road, according to said survey.

CP at 220.

Two sets of handwritten field notes for the Methow Valley Road were located by Thomson in 2019. A first set was found after Thomson learned from members of the County Road Administration Board that historic county road records are usually found in big canvas-bound books. Thomson located such a book, "Road Record A-1," in the County's public works department, and within it found the 1889 field notes, transcribed

14

on pages 59 through 77. The transcribed field notes were followed by the following

handwritten entry by auditor Baum:

> *Filed this 1st day of June, 1889.*
> *Road opened Aug. 9th, 1889.   F.M. Baum,*
> > *Auditor.*

CP at 511.

Not long thereafter, Thomson located a second, original set of the handwritten

field notes, this one signed by surveyor Carr. It was titled, "Field-Notes of the Methow

Road, Surveyed May 1889," and was located in the "Watson Draw" road file of the

public works department. CP at 331. This copy of the notes was stamped as filed in the

auditor's office of Okanogan County on June 1, 1889, and concluded with the following

certification:

*See* CP at 336-58.

Thomson sought better quality copies of relevant BOCC minutes from the state

archives than those possessed by the County and obtained minutes for the BOCC's May

6, August 8, and August 9, 1889 meetings. The minutes reflect that the report of viewers

and surveyors on the Methow Valley Road and the remonstrance received their first reading at the August 8, 1889 meeting and their second reading at the continued meeting on August 9, 1889. After recounting the second reading, the August 9 minutes state, "*Moved that road be declared open as a County Road and be named the Methow Valley road.*" CP at 204.

Another record of note located by Thomson in 2019 was a surveyor's return and certificate for a different road, the Loop Loop Road, which was submitted to the Okanogan County BOCC in the spring of 1890, approximately a year after Carr's survey laid out the Methow Valley Road. This, too, was found in the canvas-bound book of road records held in the public works department. The surveyor's May 1890 return of survey described the course of the Loop Loop road made by him under the direction of the viewers as eventually reaching "the intersection with the Methow Valley County Road the point of termination." CP at 233.

The Coalition and the County had retained experts who prepared reports or declarations based on this enlarged body of evidence. Licensed surveyor William Tackman, who was retained by the Coalition, testified that he had used the metes and bounds description of the Methow Valley Road route in Henry Carr's 1889 field notes to recreate the road's location. He then superimposed the tracing on a current map depicting existing roads. He also superimposed the tracing on the first official Government Land Office (GLO) map of Township 31, Range 23, which was published in

16

1903 and depicted then-existing roads. He also superimposed the tracing on the

combined 1901 and 1905 USGS quad maps. He testified by declaration that his exhibits

> show that, although there are some areas in which the road location differs
> from the exact metes and bounds description, the intention of the original
> metes and bounds description from the 1889 survey notes was closely
> followed.

CP at 293; *and see* CP at 1343-44, 1326-27.

Licensed surveyor Gary Erickson, who was retained by the County, performed

similar work using Carr's field notes and expressed his professional opinion that "the

existing French Creek road, in the disputed area between the locked gates, is the same

road as proposed built, and opened in 1889 as described in 'Road Record A-1' and called

the 'Methow County Road.'" CP at 642.

In a supplemental and second supplemental statement, Mr. Tackman concurred in

Mr. Erickson's conclusions, including agreeing "[t]hat the section of the existing French

Creek Road at issue in this lawsuit is the same road as the road that was proposed, built,

and opened by Okanogan County in 1889." CP at 1344.

Finally, the Coalition retained Richard Hart, an historian, who prepared a report in

which he laid out research he had conducted into the history of R. S. 2477 tracing back to

the 1866 federal Mining Act, the federal Homestead Act, the history of federal and tribal

lands in the Methow Valley, the recording of surveys, and the establishment and use of

the Methow Valley Road. Among the conclusions expressed by Mr. Hart was that the

17

Methow Valley Road became a public road before patent rights to land in the Methow Valley could have been obtained by any private landowner. He also concluded that the road was promptly constructed and was thereafter "immediately, consistently, and frequently used by the public." CP at 1334.

The Partnerships responded to this historical evidence and expert testimony with three arguments:

- First, that the County records presented did not prove that two statutory conditions precedent to a county road being declared open were complied with, to wit, a required recording of a survey and plat;

- Second, that the evidence presented by the Coalition and the County did not prove that the Methow Valley Road was opened for public use within five years of its authorization, and under the nonuser statute in effect at the time, if there was no evidence of the road's use within five years it was automatically vacated; and

- Third, that the Hart Report was inadmissible because Mr. Hart did not qualify as an expert, it summarized information rather than offering an opinion, and some of its assertions on which the Coalition relied were mere speculation.

The Partnerships had sought extensions of time to respond to the Coalition's renewed motion, saying they intended to submit a report from their own surveyor. Ultimately, they chose not to present their own survey work. They concede for purposes of the appeal that the gated section of the road at issue "is located in the same vicinity as a portion of what Respondents refer to as the old Methow Valley Road." Appellant's Br. at 5.

The Partnerships do not dispute that the GLO survey published in 1903 and the surveys reflected in USGS quad maps completed in 1901 and 1905 depict a road in the

18

vicinity of the gated segment. But they argue it is unknown whether any of the survey

work relied on for those maps was completed within five years of the 1889 authorization

for the Methow Valley Road. They also argue that the survey work shows only that a

road existed, not that it was used.

In December 2019, the trial court granted the Coalition's motion for summary

judgment and denied its motion to dismiss for lack of subject matter jurisdiction. The

Partnerships appeal the order granting summary judgment to the Coalition. The Coalition

cross appeals the denial of its motion to dismiss for lack of subject matter jurisdiction.

ANALYSIS

Whether the issue on appeal is the entry of summary judgment or the existence of

subject matter jurisdiction, our review is de novo. *Grundy v. Thurston County*, 155

Wn.2d 1, 6, 117 P.3d 1089 (2005) (summary judgment); *Outsource Servs. Mgmt., LLC v.*

*Nooksack Bus. Corp.*, 181 Wn.2d 272, 276, 333 P.3d 380 (2014) (challenge to subject

matter jurisdiction).

Summary judgment is appropriate if the pleadings demonstrate that there is no

genuine issue as to any material fact. CR 56(c). We view all facts and all reasonable

inferences in the light most favorable to the nonmoving party. *Rhoades v. City of Battle*

*Ground*, 115 Wn. App. 752, 758, 63 P.3d 142 (2002). Summary judgment is proper only

if reasonable persons could reach but one conclusion from all the evidence.

*Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005).

19

A moving defendant meets the initial burden of demonstrating no genuine issue of material fact by pointing out that there is an absence of evidence to support the plaintiff's case. If a moving defendant makes this initial showing, then the plaintiff must set forth specific facts demonstrating a genuine issue for trial. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989), *overruled in part on other grounds*, 130 Wn.2d 160, 922 P.2d 59 (1996). The complete failure of proof concerning an essential element, "'renders all other facts immaterial.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

The Partnerships' reply brief questions whether the trial court granted summary judgment to the Coalition on its claim that the Methow Valley Road became a public road by prescriptive use. The Coalition moved for summary judgment on the basis that "newly produced evidence . . . establishes that the road became a county road by petition *as well as public use* when Okanogan County in 1903 accepted the federal grant of public rights-of-way." CP at 416 (emphasis added). It devoted a section of its briefing to the latter argument. *See* CP at 433-35. The trial court's order granting summary judgment grants, without qualification, "the Defendants' and Cross-Plaintiffs' . . . Motion for Summary Judgment as against . . . Plaintiffs." CP at 37. The order unambiguously grants summary judgment in favor of the Coalition on the basis of all the argument

presented in support of its motion. Case law cited by the Partnerships in arguing

otherwise has no application in construing the order.[3]

## THE PARTNERSHIPS' APPEAL

The Partnerships filed the first appeal, and raise four assignments of error. We

first address their assignment of error to consideration of the Hart Report, and then turn to

their assignments of error to the order granting summary judgment in favor of the

Coalition.

I.      THE HART REPORT IS ADMISSIBLE UNDER ER 702

If specialized knowledge will assist the trier of fact to understand the evidence or

to determine a fact in issue, a witness qualified as an expert by knowledge, skill,

experience, training, or education, may testify thereto in the form of an opinion or

otherwise. ER 702. An expert's opinion is admissible if the witness is properly

qualified, relies on generally accepted theories, and the expert's testimony is helpful to

the trier of fact. *State v. Allery*, 101 Wn.2d 591, 596, 682 P.2d 312 (1984). We construe

helpfulness to the trier of fact broadly. *Philippides v. Bernard*, 151 Wn.2d 376, 393, 88

P.3d 939 (2004) (citing *Miller v. Likins*, 109 Wn. App. 140, 148, 34 P.3d 835 (2001)).

---

[3] The Partnerships rely on *State v. Armenta*, 134 Wn.2d 1, 14, 948 P.2d 1280 (1997), which holds that where findings and conclusions are entered by the court following trial of a disputed matter to the bench, the absence of a finding of fact in a bench trial is presumed to be a finding against the party with the burden of proof.

ER 703 permits an expert to base his opinion on facts that are not otherwise admissible if they are of a type reasonably relied on by experts in that field.

Just as our review of the summary judgment is de novo, our review of whether Mr. Hart's report is admissible under ER 702 is de novo. *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 231, 393 P.3d 776 (2017) (applying de novo standard of review to all trial court rulings made in conjunction with a summary judgment motion) (citing *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998)).

Mr. Hart is clearly an expert. While he has testified most frequently on North American tribal issues in his decades-long experience as an expert historian, his lengthy curriculum vitae includes experience and publications dealing with historical land rights in the United States, the West, and even Okanogan County and the Methow Valley. His report is helpful to appellate review: it takes into consideration not only the dozens of County records that the parties recognize as key, but is supported by over 104 citations and 37 exhibits, many of which contain additional reference documents.

The Partnerships necessarily concede that ER 703 permits an expert witness to rely on otherwise inadmissible evidence, including hearsay. Where some material issues presented by the quiet title action turn on events taking place 100 years ago and more, an expert historian will inevitably rely on hearsay. An expert is better equipped than a layperson to evaluate the available information and determine what is reliable.

The Partnerships nonetheless complain that Mr. Hart's source information either does not support his opinions or that his report presents, at most, disputed facts. Our finding that his report is admissible does not prevent the Partnerships from arguing that we should not accept his opinions. In reviewing expert testimony provided in support of summary judgment, we may consider not only the expert's specialized knowledge, but also the reasons given for the opinion and the sources of the expert's information. *Compare* 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL § 2.10, at 55 (7th ed. 2019) (instructing jurors that they need not accept an expert's opinion).

Our finding that the report is admissible does not prevent the Partnerships from presenting admissible conflicting evidence. As always, to affirm summary judgment we must be satisfied that the record demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c).

II. SUMMARY JUDGMENT WAS PROPERLY GRANTED

    A. The Partnerships' first assignment of error: "The trial court erred in ruling on summary judgment that the 'Methow Valley Road' was properly opened in 1889"

*R.S. 2477*

Almost a quarter century before Washington became a state, Congress passed legislation granting a right-of-way over the unreserved public lands of the United States

23

for the construction of highways.  Act of July 26, 1866 (Act), ch. 262, § 8, 14 Stat. 251, 253.  The legislation was codified in 1873 as § 2477 of the Revised Statutes of the United States and continued to be referred to as R.S. 2477, even after recodification.  *E.g.*, *The Wilderness Soc. v. Kane County*, 632 F.3d 1162, 1165 (10th Cir. 2011).  A principal objective of R.S. 2477 was to encourage settlement in western states.  CP at 1716 & n.42 (Hart Report) (citing a 1993 Dep't of Interior Report to Congress).

R.S. 2477 "did not itself create R.S. 2477 roads; rather, it *authorized* the states to construct highways over public lands."  *Lyon v. Gila River Indian Cmty.*, 626 F.3d 1059, 1077 (9th Cir. 2010).  And the State must have taken some affirmative act to accept the grant represented by R.S. 2477.  *Id.*  While *Lyon* speaks of authorization to "states," R.S. 2477 granted the right-of-way over all "public lands, not reserved for public uses," serving as an authorization to federal territories as well.  Act, ch. 262, § 8, 14 Stat. 251, 253.  R.S. 2477 remained in effect for 110 years until repealed in 1976, and "most of the transportation routes of the West were established under its authority."  *S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 740 (10th Cir. 2005).[4]

In 1903, the Washington Legislature authorized

> the boards of county commissioners in their respective counties . . . to accept the grant of rights of way for the construction of highways over public lands of the United States, not reserved for public uses, contained in

---

[4] The law repealing R.S. 2477 expressly preserved any valid, existing right-of-way.  *Lyon*, 626 F.3d at 1076.

> section 2477 of the Revised Statutes of the United States, and said rights-of-way shall not be less than thirty feet in width nor more than sixty feet in width as said boards of county commissioners shall determine.

LAWS OF 1903, ch. 103, § 1.  The legislation "approved, ratified and confirmed" county action accepting such rights-of-way and provided that "all such highways shall be deemed duly laid out county roads."  *Id.* § 2.

Okanogan County's commissioners accepted the grant that year, "to the extent of thirty feet on each side of the center line of all wagon roads which now exist or which have heretofore existed upon or across or over lands that are now public lands of the United States, not reserved for public uses in said Okanogan [C]ounty, Washington." *Stofferan v. Okanogan County*, 76 Wash. 265, 268, 136 P. 484 (1913) (quoting a general resolution of the BOCC entered on August 11, 1903).

*Petition for establishment of Methow Valley Road*

In 1888, the legislative assembly for the Territory of Washington created Okanogan County.  LAWS OF 1887-88, ch. 35.  It thereby created the opportunity for residents of the County to petition for the establishment of county roads under territorial law.

Controlling law for petitioning for the establishment of a county road in the March to August 1889 time frame was chapter 229 of the Code of 1881 (hereafter "the Code").[5]

---

[5] The parties have cited below and on appeal to 1879 session laws for some relevant provisions of the Code that were adopted that year as part of an act "In Relation

A county road was required to be petitioned for by "at least twelve freeholders of the county, residing in the vicinity where said road is to be laid out." CODE, ch. 229, § 2971. The petition was to be directed to the BOCC and notice of the petition was required to be posted "thirty days previous to the presentation of said petition" to the BOCC. *Id.* § 2972. The BOCC could then "appoint two disinterested freeholders of the county as viewers of said road, and a surveyor who shall be also a viewer to survey the same." *Id.* § 2973. The viewers and surveyor would then meet, take an oath, and "proceed to view, survey and lay out" the proposed road, "as near as in their opinion a good road can be made at a reasonable expense." *Id.* § 2974.

The surveyor was required to make out "a certified return of the survey of the said road, and a plat of the same," and the viewers or a majority of them were then to "make out and sign a report in writing, stating their opinion in favor of or against the establishment . . . of such road" and deliver it, together with the plat and survey of the

---

to Roads, Ferries, Bridges, and Travel on Public Highways." LAWS OF 1879, at 49. The first five sections of that act appear to be substantially similar and, for purposes of this case, substantively identical to chapter 229, sections 2970-2974 of the Code. Other provisions of the 1879 legislation cited by the parties differ from the Code, however.

Prior law not carried forward by the Code was repealed, subject to a savings clause whose purpose was to preserve any laws that were inadvertently omitted. Kelly Kunsch, *Statutory Compilations of Washington*, 12 UNIV. OF PUGET SOUND L. REV. 285, 290-91 (1989). Dozens of laws were omitted and were published shortly after the Code of 1881 in a volume entitled *Supplement to the Code of 1881*. *Id.*

The parties analyze two provisions enacted in 1879 that were not carried forward into the Code or its supplement. No argument is advanced as to why we should not view them as repealed. We do not address them.

road, to the county auditor. *Id.* It was the duty of the BOCC to cause the report of the viewers to be publicly read twice. *Id.* If satisfied that the road "will be of public utility, the report of the viewers being favorable thereto," the commissioners were to "cause said report, survey and plat to be recorded, and from thenceforth said road shall be considered a public highway, and the commissioners shall issue an order directing said road to be opened." *Id.*

The Partnerships contend that of these many steps needed to establish a road and declare it open, two were not complied with: they argue that "no survey of the Methow Valley Road was ever recorded, nor was any plat ever recorded." Appellants' Br. at 7. They rely on section 2974's provision that "the commissioners *shall cause* said report, survey, and plat to be recorded." *Id.* (some emphasis omitted). The Coalition and County contend that the Partnerships' argument does not defeat summary judgment for several reasons.

      1.     Reasonably construed, the "survey" that section 2974 requires to be recorded is the field notes

The Partnerships assert that no survey was recorded, but they do not identify what they believe the territorial legislative assembly meant in section 2974 and chapter 229 by "survey," when used as a noun. The Code does not define it. The County persuasively argues that the "survey" to be recorded is reasonably understood to mean field notes.

The parties' dispute on this score presents a question of the meaning of the statute, a question of law. *State v. Mitchell*, 169 Wn.2d 437, 442, 237 P.3d 282 (2010). The goal of statutory interpretation is to carry out the legislature's intent. *Jametsky v. Olsen*, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). Where possible, courts "must give effect to [the] plain meaning [of a statute] as an expression of legislative intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). "[T]hat meaning is discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Id.* at 11.

We first observe that the word "survey" is used in two senses in section 2974. In two instances it is clearly used to describe the process undertaken ("they shall proceed to view, *survey* and lay out"; "shall *survey* such road under the direction of the viewers"). (Emphasis added.) In two cases it is clearly used to describe a record to be created ("[the viewers'] report, together with the plat and *survey* . . . shall be delivered"; "commissioners shall cause said report, *survey* and plat to be recorded"). (Emphasis added.) A fifth reference is a hybrid, speaking of a record, but using "survey" to refer to the process ("surveyor shall . . . make out and deliver . . . a certified return of the *survey*"). (Emphasis added.) What is striking is the absence of any reference in section 2974 to delivering the surveyor's field notes, yet field notes are critical and are a record that Carr created, that was recorded, and that auditor Baum transcribed into the road record book.

28

Even more helpful in construing what is meant by a *record* "survey" are related sections 3041 and 3042 of the Code, which speak of field notes, treat them as the definitive record of the survey process, and use "field notes" and "survey" interchangeably. Section 3041 provides that where

> doubts may exist as to the legal establishment or evidence of establishment of any county road, or highway, the board of county commissioners of the proper county may, if they deem it necessary, order such highway, or any part of a county road used and traveled by the public, to be *resurveyed*, platted and recorded as hereinafter provided.

(Emphasis added.) Section 3042 speaks of the record of this resurvey as "field notes," and also as a "survey":

> A copy of the *field notes*, together with a plat of any highway or county road surveyed under the provisions of the preceding section shall be filed . . . .

after which the county auditor was required to set a date on which the BOCC

> will, unless good cause be shown against so doing, approve of *such survey* and plat, and *order them to be recorded* as in cases of the original establishment of a county road.

(Emphasis added.)

Inexplicably, the Partnerships characterize section 3041 (they refer to it as "Section 1") as "confirm[ing] that a survey and field notes are two separate and distinct documents." Appellants' Reply Br. at 26. We find no such confirmation. In fact, in the language from that provision reproduced in the Partnerships' brief, the word "survey" is reasonably read as referring to the survey process, not to a record. As earlier observed,

the Partnerships never explain what they believe a *record* "survey" would be, if not the field notes.

Other provisions of the Code of 1881 similarly speak of field notes as the definitive record of the survey process, never distinguishing them from some different record called a "survey." *See* CODE §§ 2761, 2762, 2765, 3046.

Supporting the argument that field notes are the primary if not the definitive record of the survey process are several government publications cited in the Coalition's response to the Partnerships' opening brief. The Partnerships argue we may not consider the publications, since they were not presented to the trial court. But judicial notice may be taken at any stage of the proceeding, including on appeal. ER 201(f). Matters that can be judicially noticed include facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. ER 201(b). Among materials most often judicially noticed are publications of specialized government agencies. *E.g.*, *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 978 & n.2 (9th Cir. 2007) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 332 & n.10, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961)).

One of the government publications cited by the Coalition is a glossary of surveying terms prepared by the Department of Interior's Bureau of Land Management. It defines "field notes" as "[t]he official written record of the survey, certified by the field surveyor and approved by proper authority. Originally, field notes were prepared by

30

hand, but they are now typewritten." Br. of Resp'ts Coalition, App. C at 23. The glossary defines "survey," in part, as "The plat and the field-note record of the observations, measurements, and monuments descriptive of the work performed." *Id.* at 65. *And see Cupps v. Pioneer Canal-Lake Hattie Irrig. Dist.*, 799 F. App'x 571, 573 (10th Cir. 2019) (addressing 1908 regulations of the Department of the Interior under which the required record of survey was field notes and a map).

Reasonably construed, the field notes were the record that territorial law contemplated being delivered and recorded as the survey in 1889.

> 2. The Coalition offers undisputed evidence that a plat was prepared and delivered, but no evidence that it was recorded

The Partnerships also rely on the BOCC's failure to cause recording of the plat. Unrefuted evidence was presented that a plat was prepared and delivered, but there is no evidence it was recorded.

The Coalition and County presented direct and circumstantial evidence that a plat was prepared and delivered. As recounted above, the summary judgment record included three historical records of the 1889 petitioning and approval process in which individuals certified that a plat was prepared and delivered. *See* CP at 218 (certified report of two viewers and the surveyor referring the BOCC to "the field notes, survey and plat of said road, presented herewith by the surveyor"); CP at 220 (certified surveyor's return and certificate, stating "herewith is a correct plat of said road, according to said survey"); and

CP at 358 (concluding the certification of field notes of the survey "as shown by plat").

BOCC action was demonstrably taken in August 1889 that would only have been taken if

a plat had been presented. The Partnerships have not responded with any evidence that a

plat was not prepared or delivered.

As for recording, however, the County's inability to present evidence that a plat

was recorded is some evidence that it was *not* recorded. On that score only, a question of

fact existed.

> 3. A challenge to the County's title on grounds that the road was not effectively established and opened is barred by the statute of limitations

Nonetheless, summary judgment was appropriate. In *Yorkston v. Whatcom*

*County*, this court, applying provisions of the Code of 1881, recognized that boards of

county commissioners are "'authorized and required . . . [t]o lay out, discontinue or alter

county roads and highways within their respective counties, and do all other necessary

acts relating thereto according to law.'" 11 Wn. App. 2d 815, 828, 461 P.3d 392

(quoting CODE, ch. 209, § 2673), *review denied*, 195 Wn.2d 1020, 464 P.3d 202 (2020).

The *Yorkston* court addressed a different procedural challenge to Whatcom County's 19th

century establishment of a road and held that it failed because barred by the statute of

limitations. "[A]ny challenge to the Commission's action . . . was required to be brought

in court within 20 days of the commission action (not 130 years later)," this court held,

and "in the absence of a challenge, the Commission's establishment of a road was valid," since "[t]he Commission plainly had the authority to create roads." *Id.* at 829.

The statute of limitations appears at chapter 209, section 2695 of the Code, and provides:

> Any person may appeal from the decision of the board of county commissioners to the next term of the district court of the proper district. Such appeal shall be taken within twenty days after such decision, and the party appealing shall notify the county commissioners that the appeal is taken, at least ten days before the first day of the next term of the court appealed to.

Since no appeal was taken challenging the failure to record the plat, the BOCC's action in establishing and opening the Methow Valley Road was valid.

The Partnerships attempt to distinguish *Yorkston* in two ways. First, they make a false distinction, suggesting that there was no dispute in *Yorkston* over whether the county commissioners' action was an appealable establishment of a road; they suggest it was only a dispute over the road's width. Appellants' Reply Br. at 13. But the dispute over the width of the road turned on whether the commissioners were establishing a *new* road, in which case it would be 60 feet wide. This court affirmed that the commissioners were establishing a new road. 11 Wn. App. 2d at 835. The commission action, requiring timely appeal, was synonymous with the action taken here.

Second, the Partnerships argue that they are not affirmatively seeking relief, and that "a defense to a claim is not statutorily time barred if the main action . . . is not time

barred." Appellants' Reply Br. at 13. They misstate the principle relied on in the cases

they cite. That narrow principle is, instead, that "[s]tatutes of limitation never run against

defenses *arising out of the transactions sued upon.*" *Allis-Chalmers Corp. v. City of N.*

*Bonneville*, 113 Wn.2d 108, 112, 775 P.2d 953 (1989) (emphasis added) (citing *Ennis v.*

*Ring*, 56 Wn.2d 465, 471, 353 P.2d 950 (1959)). No transaction between the Partnerships

on the one hand, and the county and the public, on the other, was sued upon here.

Establishment of a public road by petition or prescriptive use was not a *transactional*

defense.[6]

And the Partnerships are using the failure to record the plat as a sword, not a

shield. In a quiet title action, superior title prevails. RCW 7.28.120. In *Yorkston*, the

contention that flawed procedure prevented establishment of a county road was essential

to the Yorkstons' claim of superior title. Here, too, challenging the procedure followed

in establishing French Creek Road is essential to the Partnerships' claim of superior title.

    B.    The Partnerships' second assignment of error: "The trial court erred in not
             finding that the 'Methow Valley Road' was abandoned"

The Partnerships' second assignment of error is that summary judgment was

improper because even if the Methow Valley Road was once a county road, it was

---

[6] Addressing the statute of limitations in its reply brief, the Partnerships argue for the first time that the Coalition's motions are time-barred by its failure to timely appeal the BOCC's Resolution 443-2009. The Partnerships did not advance the argument in its opening brief (or for that matter, in the trial court). We will not consider it. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

abandoned—a remarkable argument, considering that petitions asking that it be abandoned were thrice denied by the BOCC. As evidence of abandonment, they cite alleged acquiescence in the existence of locked gates, a failure to maintain the road, and the BOCC's Resolution 443-2009.

The Washington Supreme Court held in 1963, in *Commercial Waterway District No. 1 of King County v. Permanente Cement Co.*, that "[l]and held by a municipal corporation in trust for the public is not subject to being alienated unless expressly so provided by the legislature." 61 Wn.2d 509, 513, 379 P.2d 178.

In *Nelson v. Pacific County*, 36 Wn. App. 17, 23, 671 P.2d 785 (1983), this court held that "[p]roperty once acquired and devoted to public use is held in trust for the public and cannot be alienated without legislative authority, either express or implied." The decision points to "[n]umerous" sections of Title 36 RCW that deal with a county's disposition of lands held in its governmental capacity that require public notice, public hearings, and in some cases studies prior to disposition. *Id.* *Nelson* characterizes these provisions as "comprehensive and demonstrat[ing] a strong legislative intent that property held for the public use and benefit not be summarily disposed of without giving the public affected a significant opportunity to participate." *Id.* at 24.[7]

---

[7] *Nelson* attributed no significance to *Johnston v. Medina Improvement Club, Inc.*, 10 Wn.2d 44, 116 P.2d 272 (1941), a case on which the Partnerships rely, observing that the issue of abandonment in that case was minor and secondary to the principal, standing, issue presented.

35

The Partnerships identify no legal authority that the evidence they rely on as "abandonment" suffices. They point to their gates, yet as recounted above, the Partnerships and their predecessors were put on notice repeatedly that their gates were illegal. And it is fundamental that title by adverse possession cannot be acquired against the state or held by a municipality for public purposes in its governmental capacity. *Com. Waterway*, 61 Wn.2d at 512.

As for the complained-of failure to maintain, it is well established that a county need not expend public resources to maintain county roads, and roads are not thereby deprived of their public character. RCW 36.75.300(3) (primitive roads). And there is evidence of some maintenance. For instance, records of a BOCC meeting on September 20, 1976, reflect an appearance by petitioners seeking increased maintenance of French Creek Road who "state[d] that the road is a school bus route and has not been properly maintained, yet is traveled by many." CP at 864. The minutes continue:

> The commissioners explained that the county has already spent as much or more on the French Creek Road as any other road in the Methow or county. [sic] They realize it is a problem road and will continue to do more maintenance. At the present time there is a water trailer and grader working on the road.

*Id.*

As for Resolution 443-2009, it was the end result of the third unsuccessful effort at vacating portions of the road. The threat of litigation eventually persuaded the BOCC to disclaim its ability to prove ownership. But the fact remains that on the merits, the

Partnerships' petition had been denied. Resolution 443-2009 is of no help to the

Partnerships.

Also unhelpful to the Partnerships' position is their reliance on *Foster v. Bullock*,

184 Wash. 254, 50 P.2d 892 (1935). The case predates *Commercial Waterway District

No. 1*, so the scope of its continuing viability is uncertain. In any event, it holds that once

a road is established as public, it is not a question of how much or how little the public

uses the road, "If it is used at all, then there is no abandonment." *Id.* at 257. The fact that

the road at issue in *Foster* was used only by the abutting landowners was enough to

defeat a claim of abandonment.

Here, continuing public interest in, and use, of the gated segment was

demonstrated each time there was a petition to vacate. The Partnerships admit that

ongoing public "trespasses" were its reason for bringing this action. And the Partnerships

admit using the gated section themselves. Vis-à-vis their larger landholding neighbor,

DNR, the Partnerships *are* the public. Even under *Foster*, they cannot establish

abandonment.

      C.     The Partnerships' third assignment of error: "The trial court erred in not
             applying the Non-User statute"

Finally, the Partnerships rely on a nonuser statute that was approved March 7,

1890. LAWS OF 1889-90, ch. 19, § 63. It provided:

      Any county road, or part thereof, which has heretofore been or may
      hereafter be authorized, which remains unopened for public use for the

> space of five years after the order is made or authority granted for opening the same, shall be and the same is hereby vacated, and the authority for building the same barred by lapse of time.

*Id.* § 32. The burden of showing that a road has remained unopened for public use for the period named in the statute "[is] upon those who rest their claims upon such a fact"— here, the Partnerships. *Brokaw v. Town of Stanwood*, 79 Wash. 322, 325-26, 140 P. 358 (1914).

The Coalition and County presented evidence that the road was opened for public use within five years. The survey field notes for the Loop Loop Road in 1890 set its terminus at the Methow Valley Road, evidence that the Methow Valley Road existed the year after it was authorized.

The road is included in a USGS quad map completed in 1901, based on surveys conducted in 1897 and 1899. It is included in a survey of Township 31 North, Range 23 East, W.M., performed by the United States Government Land Office in September and October of 1902 that was approved in November 1903. It is included in a second USGS quad map completed in 1905, based on a survey performed in 1903. It is true, as the Partnerships argue, that standing alone the federal surveys prove at most that the road was opened for use by 1899, not 1894. They establish, however, that the County was serious about the need for the road and willing to expend resources to construct it. Absent some reason for delay—and none has been shown—one can reasonably infer that

steps would have been taken to construct the road soon, to meet the need and avoid operation of the nonuser statute.

The Hart Report endorses the inference that the road was built promptly, based on historical evidence. It points to the fact that prominent residents of the area petitioned for establishment of the road soon after Okanogan County was established. It points to the support the road proposal enjoyed. It even points to the remonstrators' acknowledgement that over 100 people in the upper Methow Valley badly needed a road: that they were "virtually shut out from all communication with the outside world" for lack of one. CP at 214.

The Partnerships present no affirmative evidence that the road was not opened for public use within five years. Instead, they ask us to hold the lack of more specific evidence of the progress of construction and use against the county. But our Supreme Court rejected the same argument over a century ago in *Brokaw*, in which evidence was wholly lacking on whether a street was opened for use within five years. The Court asked, "Shall we presume [the road was unopened], in the total absence of proof upon that question?," and answered, "We are of the opinion that we should not do so." 79 Wash. at 325.

In addition to offering evidence of the road's opening, the Coalition and County argue that if their evidence is insufficient, the doctrine of laches forecloses an attack based on the nonuser statute.

39

Laches is an equitable defense based on estoppel and applies when the defendant asserting the doctrine affirmatively establishes: "(1) knowledge by plaintiff of facts constituting a cause of action or a reasonable opportunity to discover such fact; (2) unreasonable delay by plaintiff in commencing an action; and (3) damage to defendant resulting from the delay in bringing the action." *Real Progress, Inc. v. City of Seattle*, 91 Wn. App. 833, 843-44, 963 P.2d 890 (1998) (citing *Davidson v. State*, 116 Wn.2d 13, 25, 802 P.2d 1374 (1991)). Similar to this case, *Real Progress* involved a plaintiff's claim that the city of Seattle failed to open a street dedicated to it by plat in 1884. This court agreed that the first two elements of laches were easily met: the plaintiff and its predecessors were charged with knowledge of the facts constituting nonuse, and waiting over 100 years to bring an action "can easily be considered unreasonable." *Id.* at 844.

At issue was only whether the city was damaged by the delay in bringing the action. The city could not show damage in *Real Progress*, because the evidence was clear that the street was *never* opened.

We conclude that here, too, the Coalition cannot demonstrate that it was damaged by delay because it has been able to present evidence that the road was timely opened. If its evidence was insufficient, however, laches *would* apply, since the delay in bringing the action is the reason so little evidence is available.

40

D.      Alternatively, summary judgment was properly granted on the basis of undisputed evidence of prescriptive use

If the Methow Valley Road was not established as a county road by petition and acceptance of the federal grant under R.S. 2477, then undisputed evidence establishes that it became a county road by prescriptive use and acceptance of the federal grant.

In *Smith v. Mitchell*, an 1899 Washington decision, it was contended by the defendant Mitchell, a homesteader in Whitman County, that a public road could not have been created by prescription while the land on which his predecessor had settled was government land.  21 Wash. 536, 539, 58 P. 667.  He contended the public's use would not be adverse to government grantees until they were issued a patent.  *Id.*  While Mitchell was able to cite authority for his position, the Supreme Court observed that the cases on which he relied did not address R.S. 2477.

The Court observed that R.S. 2477 "does not make any distinction as to the methods recognized by law for the establishment of a highway . . . and hence a highway may be established across or upon such public lands in any of the ways recognized by the law of the state in which such lands are located."  21 Wash. at 540.  In Washington, "the establishment of highways by prescription is recognized, and roads may be established by use," as many public highways had been.  *Id.* (internal citation omitted).  It recognized that many such highways in the state "had their beginning at a time when all, or nearly all, of the adjacent land belonged to the general government."  *Id.* at 540-41.  It held that

41

"when generally traveled by the public without interruption or hindrance for a period of 10 years, they must be regarded as firmly established in law." *Id.* at 541.

This was affirmed in *Stofferan*, in which, speaking of establishment of a road traced to a grant under R.S. 2477, our Supreme Court said:

> [W]e have repeatedly held that roads may be established by prescription by the use by the public for a period of not less than seven years, where the same have been worked and kept up at the expense of the public, as provided in Rem. & Bal. Code, § 5657 . . . or, where not so kept up at the public expense, simply by continued use by the public for a period co-extensive with the period of limitation for quieting title to land, which is, in this state, ten years.

76 Wash. at 273. It held that R.S. 2477 "takes effect as a grant . . . when the road has been established on petition as prescribed by our statute, or by . . . prescription prior to the attaching of any adverse rights upon the public lands over which it passes." *Id.* at 274.

Undisputed evidence establishes that the first private land patent in the vicinity of today's French Creek Road was granted in 1905, 16 years after the road was petitioned for and declared open, and 2 years after it became a road by operation of R.S. 2477. Accordingly, any patents issued to the Partnerships' predecessors were burdened with the county right-of-way.

Summary judgment was properly granted to the Coalition.

THE COALITION'S CROSS APPEAL

The Coalition moved to dismiss the quiet title action for lack of subject matter jurisdiction on grounds that the Partnerships and their predecessors had submitted the issue of vacating portions of French Creek Road to the BOCC and were bound by its adverse decisions.  It relied on *Bugli v. Ravalli County*, a 2018 decision by the Montana Supreme Court involving similar facts: private landowners who sought to quiet title in a roadway after the Ravalli County Commissioners made factual findings, in response to their petition asking the county to abandon the roadway, that the roadway was public and abandoning it was contrary to the public interest.  392 Mont. 131, 422 P.3d 131.  The Montana Supreme Court held that

> [b]y submitting their petition to abandon the road, Landowners voluntarily chose, accepted, and submitted to the BOCC's jurisdiction and committed their road dispute to the statutory process that arises from the statutory abandonment process, including necessary fact-finding.  Landowners are now bound to that process, and cannot relitigate these issues in a separate forum.

*Id.* at 137.

Controlling case law now clearly establishes that Washington courts' jurisdiction has only two components—jurisdiction over the person and subject matter jurisdiction—and the courts' subject matter jurisdiction is defined by the Washington Constitution. Statutory limitations on a court's power and authority to render judgment, for instance, are not jurisdictional "because '[t]he legislature cannot restrict the court's jurisdiction

where the constitution has specifically granted the court jurisdiction.'" *Freedom Found.*

*v. Teamsters Loc. 117 Segregated Fund*, 197 Wn.2d 116, 141, 480 P.3d 1119 (2021)

(alteration in original) (quoting *In re Marriage of Buecking*, 179 Wn.2d 438, 448, 316

P.3d 999 (2013) (citing *State v. Posey*, 174 Wn.2d 131, 138, 272 P.3d 840 (2012))).

Article IV, section 6 of the Washington Constitution expressly establishes that our

superior courts "shall have original jurisdiction in all cases at law which involve the title

or possession of real property." *See also* RCW 2.08.010. Under Washington law, the

superior court's subject matter jurisdiction was clear.

In addition, we have held that a county's decision whether to vacate a road is

legislative, not quasi-judicial, and is not judicially reviewable absent fraud, collusion, or

interference with a vested right. *Coalition of Chiliwist v. Okanogan County*, slip op. at 9-

12, No. 34585-8-III (Wash. Ct. App. Mar. 16, 2017) (unpublished), https://www

.courts.wa.gov/opinions/pdf/345858_unp.pdf.[8] The process of vacating a road "does not

involve the application of existing law to past or present facts." *Id.* at 11. Not only is the

process different; so is the question presented. *Compare* RCW 7.28.120 ("the superior

title, whether legal or equitable, shall prevail") *and* RCW 36.87.060(1) (county

legislative authority finds whether "the county road is . . . useful" or not, and whether

---

[8] As an unpublished decision, it has no precedential value and is not binding.
GR 14.1.

"the public will be benefited by the vacation"). We adhere to the reasoning in *Coalition of Chiliwist* as persuasive.

However sound the reasoning of *Bugli* under Montana law, the Coalition's argument that the superior court lacked subject matter jurisdiction cannot succeed under Washington law.

## Attorney fees

The Coalition requests an award of reasonable attorney fees under RAP 18.9, arguing the Partnerships' appeal is frivolous.

We enjoy discretion under RAP 18.9(a) to "order a party or counsel . . . who uses these rules for purpose of delay, files a frivolous appeal, or fails to comply with these rules to pay terms or compensatory damages to any other party who had been harmed by the delay or failure to comply." An appeal is frivolous if the court is convinced that it presents no debatable issues on which reasonable minds could differ and is so lacking in merit that there is no possibility of reversal. *In re Marriage of Foley*, 84 Wn. App. 839, 847, 930 P.2d 929 (1997). In determining whether an appeal is frivolous we consider, among other things, a party's right to appeal, that all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant, and that an appeal that is affirmed simply because the arguments are rejected is not frivolous. *Tiffany Fam. Tr. Corp. v. City of Kent*, 155 Wn.2d 225, 241, 119 P.3d 325 (2005), *abrogated on other grounds by Yim*

*v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019).  We decline the request for an award of reasonable attorney fees.

We affirm the trial court's denial of the Coalition's motion for dismissal for lack of subject matter jurisdiction.  We affirm its order granting summary judgment to the Coalition that the gated segment of the French Creek Road became a county road by petition as well as public use when Okanogan County in 1903 accepted the federal grant of public rights-of-way.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Lawrence-Berrey, J.